IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| CECILE M. LESCS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 5:19-cv-00061-EKD |
| | ) | |
| | ) | By:  Elizabeth K. Dillon |
| | ) | United States District Judge |
| CITY OF WINCHESTER, KEVIN | ) | |
| SANZENBACHER, LTN BAUSERMAN, | ) | |
| ANIMAL WARDEN LIANG, ANIMAL | ) | |
| WARDEN SLONAKER, MR. HESS, PRIOR FIRE | ) | |
| CHIEF JOHN DOE, DETECTIVE LISA HYDE, | ) | |
| MR. GRISDALE, JOHN WILLINGHAM, EDEN | ) | |
| FREEMAN, JOHN DOE POLICE OFFICERS, | ) | |
| JOHN DOE VAGRANTS, JOHN DOE | ) | |
| NEIGHBORS, AND DANNY MOWREY, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Pro se plaintiff Cecile M. Lescs alleges that on August 24, 2017, she was detained, handcuffed, and then transported to a hospital for purposes of a mental health commitment in violation of the Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment. In addition to these claims under 42 U.S.C. § 1983, Lescs brings state law claims for gross negligence, abuse of process, fraud, false pretenses, and trespass.  Lescs further alleges conspiracy, pursuant to 42 U.S.C. §§ 1983 and 1985, to commit spoliation regarding a state Freedom of Information Act (FOIA) request to facilitate the cover-up the facts of the August 24, 2017 incident. She also includes claims for "crimes against humanity" in violation of the Geneva Convention and the United States War Crimes Act.  Finally, Lescs's complaint includes a "motion" to declare the Health Insurance Portability and Accountability Act (HIPAA) unconstitutional and a motion to declare the Virginia law governing mental health commitments unconstitutional.

It is unclear against whom Lescs brings some of her claims.  She has also asserted unrelated claims concerning: efforts over the years to cause her bodily injury through accidents; vagrants and neighbors who have, throughout the years, allegedly been reporting her as agents of the City and who have vandalized her home; many citations regarding her house; and her reports of crimes by vagrants that are disregarded.

In two separate motions, most of the defendants move to dismiss the complaint, and defendant Hyde also moves, in the alternative, for summary judgment.  For the reasons set forth below, the City's motion to dismiss will be granted in part and denied in part, the individual defendants' motion to dismiss will be granted in part and denied in part, and defendant Hyde's motion for summary judgment will be granted as to Lescs's seizure for purposes of a mental health evaluation.  The case will go forward on Lescs's Fourth Amendment claims against Animal Warden Chaz M. Niang and Animal Warden Slonaker for allegedly detaining and handcuffing plaintiff without cause, Lescs's Fourth Amendment claim against Detective Lisa M. Hyde for alleged excessive use of force by continuing to leave her handcuffed in her front yard, and Lescs's state law claims against Niang, Slonaker, Hyde, and the City.[1]

## I.  BACKGROUND

### A.  Defendants In This Action

Defendants in this action, with their positions as alleged in the complaint, are the City of Winchester, Kevin Sanzenbacher (former Winchester Police Department (WPD) Chief), Lt. Bauserman (WPD and interim director of the same), Animal Warden Liang (whose proper name is Chaz M. Niang and will be referenced a Niang herein) (WPD), Animal Warden Slonaker (WPD),

---

[1] Lescs filed an objection to not having a hearing on these motions.  (Dkt. No. 25.)  The court determines that a hearing is not necessary to resolve the pending motions.

Mr. Hess (Senior Inspector of Winchester Department of Zoning and Inspections (WZD)), Former Winchester Fire Chief John Doe (plaintiff attempted to serve as Allen Baldwin), Detective Lisa Hyde (WPD), Mr. Grisdale (Director of WZD), John Willingham (Winchester City Council member and former Council President), Eden Freeman (Winchester City Manager), Danny Mowrey (WPD and WZD employee and employee of the Winchester Fire and Rescue Department), John Doe Police Officers, John Doe Vagrants, John Doe Neighbors, and Dale Imans.  The City of Winchester filed a motion to dismiss for failure to state a claim.  The individual defendants (except for Dale Imans[2] and the John Doe Vagrants[3] and Neighbors[4]) filed a separate a motion to dismiss for failure to state a claim.  Hyde also moved for summary judgment.  Because this case is before the court on motions to dismiss and an alternative motion for summary judgment, the court will set forth plaintiff's allegations and facts asserted in her affidavit separate from the facts asserted in the affidavits filed on behalf of defendant Hyde's alternative motion for summary judgment.

**B.  Plaintiff's Allegations**

Lescs filed her complaint with an affidavit.[5]  The court will look at both to consider the alleged claims.

_____

[2] Dale Imans is not in the caption of Lescs's complaint, but he is included in the body of the complaint in Lescs's list of defendants as the former Winchester City Manager who "resigned many years ago."  (Compl. ¶ 20.)  On August 26, 2019, the court issued an order directing Lescs to complete and return a summons and USM-285 form for each defendant, warning that if the forms are not submitted within fourteen days, the complaint may be dismissed.  (Dkt. No. 3.)  Lescs did not submit the required forms for Imans.  Therefore, the court will dismiss the claims against Imans without prejudice.

[3] On November 4, 2019, the court issued a notice directing plaintiff to notify the Clerk of this Court that service was accomplished on the John Doe Vagrants, failing which these defendants would be dismissed from this suit without prejudice.  (Dkt. No. 16.)  Lescs failed to provide such notice, so the John Doe Vagrants will be dismissed.

[4] According to Lescs's affidavit, Lescs speculates that the neighbors, including a man named Hamilton, have been paying the vagrants, on behalf of the Police Department, for information on Lescs.  For the reasons stated below, Lescs's claims against "John Doe Neighbors" will also be dismissed.

[5] Lescs has filed four affidavits in this matter: one with her complaint (Dkt. No. 2-2), one in support of a motion for an extension of time (Dkt. No. 18-1), one in opposition to the pending motions (Dkt. No. 20-1), and one on May 1, 2020, asserting that the WPD did not take her statement concerning a violent event she witnessed on her street

### 1.  Events of August 24, 2017

Lescs alleges that on August 24, 2017, defendants concocted a scheme to have her committed, involuntarily, to the psychiatric ward of the Winchester Medical Center (WMC). (Compl. ¶ 23, Dkt. No. 2.)  Defendants were also planning to take Lescs's home on the ground that she was "under a disability" pursuant to a Virginia statute.  (*Id.* ¶ 24.)  Lescs claims that her cats were taken away without probable cause and eventually euthanized, but she admits she gave up custody of the cats.  (*Id.* ¶¶ 25–26; Lescs Aff. ¶ 12, Dkt. No. 2.)

According to Lescs, two women, who are not defendants and are informants paid by defendant Mowrey, falsely reported "most likely" that she had "dead cats" and was "mentally sick," which led to the events of August 24, 2017.  (Lescs Aff. ¶¶ 10–12.)  On that day, she was in her car cleaning it, behind her house, when she was handcuffed by defendants Niang and Slonaker without an arrest warrant and transported in a police car to the front of her house.  (*Id.* ¶ 13.)  While seated at the front of her house in handcuffs, she was quiet and behaving in a controlled manner.  (Compl. ¶ 26.)  In total, Lescs alleges that she was "restrain[ed] through physical force and handcuffs for one hour and forty-five minutes."  (*Id.* ¶ 39.)  Lescs was told by the animal warden that he would kick in Lescs's front door if she did not give him the combination to her front door locks.  Lescs gave him the combination, and the door was opened.  (Lescs Aff. ¶ 14.)  Mr. Hess told Lescs that he would take photos of the interior of the house from the open front door.  The Fire Marshal (identified as Mr. Luttrell, who is not a defendant in this case) would then enter the house and take photos of the rest of the house.  This resulted in Lescs's house being condemned due to the presence

---

on April 11, 2020 (Dkt. No. 27).  Three of the four affidavits were sworn.  The affidavit filed in opposition to the pending motions was not sworn as to the asserted facts.  Instead, only the fact of mailing was certified under penalty of perjury and notarized.  (Dkt. No. 20-1.)  The only affidavit sworn to and relevant to these motions is the affidavit filed with the complaint.  (Dkt. No. 2-2.)  Thus, it is the only one considered for purposes of the sufficiency of allegations regarding the motions to dismiss and in opposition to the motion for summary judgment.

of combustibles (fabrics, shoes, books, and sheets) that were strewn about.  Lescs claims that these items were strewn about by persons entering her home to ransack it.  (*Id.* ¶ 15.)  Lescs did not give permission to enter her house.  (*Id.* ¶ 16.)  According to Lescs, a Northwestern Regional Mental Health Worker who was at the scene stated to Detective Hyde, "I think there is something there."

Lescs was transported to the WMC emergency department where a room had been prepared for her.  (*Id.* ¶ 17; Compl. ¶ 27.)  Outside the room was an armed police officer.  Inside the room was an unidentified social worker, Detective Hyde, and emergency room staff.  A physician examined Lescs and asked her whether she heard voices and if she knew why she was at the hospital.  Lescs denied hearing voices and said she "would like to know more" about why she was there.  (Compl. ¶ 27.)

Hours later, a senior psychologist arrived and interviewed Lescs for forty-five minutes.  The psychologist determined that Lescs would not be committed because she was not mentally ill.  The psychologist stated that Lescs took care of her health and medical needs and that she "looked pretty good."  (*Id.* ¶ 28.)

### 2.  FOIA allegations

Lescs's complaint also discusses a Freedom of Information Act (FOIA) request for records regarding plaintiff, her house, her cats, and the events of August 24, 2017.  The Winchester Police Department (WPD), Winchester Social Services Department, and the Virginia Health Department all responded that no such records existed.  (*Id.* ¶ 29.)  Lescs maintains that this was a fabrication, and the records were "obviously" concealed or destroyed.  (*Id.* ¶¶ 30–32.)  The FOIA issue was apparently the subject of a state court petition that was denied with prejudice.  (Exhibit to Brief in Support of Individual Defendants' Motion to Dismiss, Dkt. No. 13.)

### 3.  Miscellaneous allegations

Additionally, Lescs alleges that there have been numerous attempts to cause her serious bodily injury and/or death over the course of several years.  On one occasion, Lescs was hit on the passenger side rear bumper by a tractor trailer while she was driving to work on Interstate 81. Virginia State police charged her with causing the accident, but she was found not guilty at trial. Lescs complains that she has not been able to recover from the other driver's insurance company and her car is still damaged.  (*Id.* ¶ 33.)

Lescs's house has been cited an "extraordinary" number of times by defendant Mr. Hess and the Winchester Zoning and Inspections Department.  (*Id.*)  The "current" citation is for a failure to sign a vacant house registry.  Lescs's house has also been subject to numerous break-ins.  Her house has been ransacked, and two cats were poisoned and died.  During one instance, Lescs's dog Nora was attacked.  (*Id.* ¶ 34.)  Lescs complains that WPD refused to do anything about the break-ins. (*Id.* ¶ 35.)[6]  Instead, the response of WPD was that Lescs was "paranoid" and thought people were "after" her.  (Lescs Aff. ¶ 26.)  Lescs stopped sleeping in her house because of the break-ins.  (*Id.* ¶¶ 33–34.)  Instead of sleeping in her home, Lescs would sleep in her car in a Walmart parking lot. (*Id.* ¶ 47.)

### C.  August 24, 2017 Incident According To Affidavits Submitted By Hyde

Detective Hyde, as noted above, moved for summary judgment,[7] and her motion is supported by several affidavits.  (Summ. J. Br., Affidavits of Lisa Hyde (Hyde Aff.), DonnaJeane C.

---

[6] Lescs alleges that these kinds of "criminal acts" have been happening in her life since she was a plaintiff in a personal injury case against Dow Chemical.  "The case went to the U.S. Supreme Court.  Chief Justice Rehnquist was the Plaintiff's reader.  The day before her last brief was due, 2 members of her family died.  She was distraught and could not get the brief filed on time.  The case went forward with the remaining plaintiffs.  The plaintiffs were rewarded by an affirmative ruling from the U.S. Supreme Court."  (Compl. ¶ 35.)

[7] The court notes that, in opposition to Hyde's motion for summary judgment, Lescs moved for discovery. (*See* Dkt. No. 20.)  Lescs has not shown, by affidavit, declaration, or otherwise, that "for specified reasons," she "cannot present facts essential to justify" her opposition to the motion.  Fed. R. Civ. P. 56(d).  The court issued a *Roseboro*

Trillio (Trillio Aff.), Katlynn Slonaker (Slonaker Aff.), Chaz N. Niang (Niang Aff.), Dkt. No. 15.)
The affidavits provide further detail about the incident that occurred on August 24, 2017.

On that date, Animal Control Officer Niang and WPD police officer Katlynn Slonaker
responded to a complaint about cruelty to animals and a welfare check. (Slonaker Aff. ¶¶ 1–5;
Niang Aff. ¶ 4.) They arrived at Lescs's residence, which fit the description of the complaint.
(Slonaker Aff. ¶ 5.) The north side of the residence looked uninhabitable, and the exterior of the
house was dilapidated and in poor condition. (*Id.* ¶ 8.) Behind the house were two vehicles full of
household items and trash. It appeared that someone was living in the cars. There were plates with
food in the backyard along with a lot of trash and debris. Plastic containers were being used as
cathouses. (*Id.* ¶ 9.)

Lescs was in one of the vehicles, and the officers asked her to step out. Lescs stated that she
was the owner of the property. The officers attempted to speak to her about any cats she was caring
for inside or outside the home. Lescs was unsure how many cats she had inside the residence.
(Slonaker Aff. ¶ 10; Niang Aff. ¶ 18.) Lescs had a blank, non-responsive affect, and her skin was
ashen. (Niang Aff. ¶ 17.) Asked about the cats' welfare, Lescs stated that she did not have any
veterinary records and that they had not had any veterinary care in years. (*Id.* ¶ 19.) While trying to
talk to Lescs about the cats and the property, she kept trying to get back into her car. Because Lescs
repeatedly reached into her car and ignored the officers' commands, they detained her and placed
her in handcuffs for safety purposes. Due to the mosquitoes, the officers moved Lescs to the front
of her residence. Officers removed the handcuffs and put Lescs in a chair near her porch.

---

notice on November 4, 2019, indicating that Lescs had 21 days to "submit any further counter-affidavits or other
relevant evidence contradicting, explaining or avoiding Defendant's evidence." (Dkt. No. 17.)

(Slonaker Aff. ¶ 10.)  Niang requested permission to check the status of the cats and the home for their safety and well-being, but Lescs declined.  (Niang Aff. ¶ 21.)

Officer Niang contacted Hyde to respond to a hoarding/animal cruelty situation at Lescs's residence.  Officer Niang then left the scene to obtain a search warrant for the house.  (Slonaker Aff. ¶ 13.)  The officers also called Trevor Hess, Code Enforcement, due to the condition of the property, and the Fire Marshal arrived.  (*Id.* ¶ 14.)

Hyde is a corporal for the WPD.  (Hyde Aff. ¶ 1.)  Hyde has been employed with the WPD for almost twenty-two years.  She was one of the first officers in WPD to receive Crisis Intervention Training (CIT), and she now trains other WPD officers in CIT.  She began working with the Northwestern Community Service Board (NWCSB) on a mental health diversion program, providing resources and services to at-risk people, and trying to be proactive with mental health. Hyde has learned that there is a direct correlation between a reduction in the number of police calls and the provision of resources and services needed by those dealing with mental illnesses.  (*Id.* ¶ 2.)  Hyde worked with DonnaJeane Trillio (not a defendant) as part of a co-responder team, a special team comprised of a mental health professional and a law enforcement officer.  (Trillio Aff. ¶ 3.) The purpose of a co-responder team is to assist people during a mental health crisis.  (*Id.* ¶ 4.) Trillio works for NWCSB as a CIT Coordinator.  (*Id.* ¶ 1.)  Based on Hyde's experience, persons who hoard often have mental health issues.  (Hyde Aff. ¶¶ 4–6.)

When Hyde and Trillio arrived at Lescs's property, they went to the back of the property, where certain vehicles were located.  There was a lot of trash in the vehicles which, according to Hyde, had an unpleasant smell.  There were lots of bugs and insects near and in the vehicles.  This further confirmed to Hyde that there appeared to be a hoarding situation.  (*Id.* ¶ 7.)  Lescs voiced attachment and concern for her animals, but the conditions in her home were unlivable.  (Trillio Aff.

¶ 14.)  Trillio believed that Lescs' statements were incongruent with the facts.  (*Id.*)  Like her car, Lescs's house was full of trash.  (*Id.* ¶ 15.)

Hyde spoke with Lescs about the situation and asked whether there were any dead or sick animals in her home.  Lescs contradicted herself, stating that none should be dead, however, one may be sick, but he should be well when they find him.  (*Id.* ¶ 11.)  Hyde asked Lescs if there was a hoarding situation inside her residence.  Lescs denied being a hoarder but stated she was collecting items to "open a thrift store."  Lescs later mentioned that, while she could not afford to buy her own store, she kept collecting items in any event.  (*Id.* ¶ 12.)

Hyde told Lescs that she had been to Lescs's home previously due to complaints from neighbors relating to concerns for her mental welfare and the condition of her property.  At that time, the neighbor advised Hyde that there was no electricity or running water in the home, and it appeared to be full of trash.  Lescs responded that her neighbors often break into her house, mess things up, and steal her belongings.  Lescs complained that no one would do anything about the break-ins.  Hyde said she did not know how people were entering her home, as there were no signs of a break-in and nothing was ever reported missing.  (*Id.* ¶ 13.)

Lescs then made what Hyde believed were delusional comments about defendant Officer Danny Mowrey.  She said Officer Mowrey had paid informants in the area watching her and her property, and mysteriously, five of the informants were now dead.  Lescs then mentioned a supposed informant's name, Vicky Brinklow, who complained about Lescs's 18-year-old dog, and then the dog and Ms. Brinklow died.  Lescs further stated that she had a series of conversations with West Virginia police about her situation in Winchester, who agreed that something was wrong, surrounded her car in a Walmart parking lot, landed a helicopter in the lot, and attempted to take her into custody.  Lescs was not taken into custody, however, because nothing was wrong with her.

Ultimately, Lescs's statements did not appear logical to Hyde and were mostly non-sensical and unresponsive.  (*Id.* ¶ 14.)

Hyde then asked Lescs if she had ever been diagnosed with a mental health condition or illness.  Lescs kept deflecting her questions and began talking about her litigation experience against Dow Chemical.  She stated that she has headaches, twitches, fatigue, lack of taste, lapse of memory, and peripheral nerve damage from the pesticides.  According to Lescs, Dow recycled nerve gas into pesticides, she was exposed to those pesticides and had to represent herself as no local attorney had ever been to the Supreme Court, and she had a law degree from George Mason. Lescs then mentioned numerous attempts on her life by tractor-trailer truck drivers while driving to work.  In one incident, she claimed she was boxed in by two tractor-trailer trucks on Interstate 66 late at night and she had to get away from them.  Lescs said that two of the attempts on her life resulted in motor vehicle crashes.  (*Id.* ¶¶ 15–16.)

Lescs further told Hyde that she has spent the last four years living in Walmart parking lots and stays in church shelters during the winter.  She said people have stolen all her jewelry, and she checks on her cats every day.  (*Id.* ¶ 19.)

Hyde asked Lescs if she was on any medications and asked about her diet and nutrition. Lescs stated she was taking thyroid medication and had eaten breakfast that day.  Hyde asked Lescs if she had any other medical issues or conditions, such as a urinary tract infection (UTI), which can cause irrational thinking and behavior.  Lescs advised that she did not have a UTI and had been recently checked for one.  Hyde asked Lescs numerous times to consider voluntarily checking herself into WMC, but Lescs insisted there was nothing wrong with her.  (*Id.* ¶ 22.)

Hyde continued to discuss her concerns with Lescs about her thoughts, behaviors, and comments as Hyde was aware Lescs's issues could be due to physical/medical or mental health

issues.  Hyde asked again if Lescs would submit to a voluntary evaluation, but Lescs declined.

Hyde inquired about family members who could help.  Lescs gave Hyde a friend's name but then

said not to call him.  Lescs gave Hyde her sister's phone number, Carol Ryan, who lives in New

Jersey.  Hyde asked if there was anyone closer, and Lescs said she has a twin sister in West

Virginia, but they do not get along.  Over the phone, Ryan told Hyde that Lescs is a "collector" who

"needs help."  Ryan said that Lescs has a law degree, is "much smarter than everyone else," and

will let everyone know that to be the case.  Ryan stated that Lescs works in health care, but she and

her other sister do not agree with her lifestyle and the way she treats animals.  Ryan advised that she

had wanted to contact the ASPCA about how Lescs treated her dog.  Hyde allowed Lescs to speak

with Ryan on speaker phone, and Ryan stated she could not care for Lescs because her husband had

dementia.  (*Id.* ¶¶ 23, 26.)  Lescs continued to deflect Hyde's questions and concerns and stated that

her neighbor is the ringleader of the informants and he came into her home and beat up her dog.

(*Id.* ¶ 24.)  Lescs's statements and comments were disjointed and did not follow any logical pattern.

(*Id.* ¶ 25.)

When search warrants arrived at Lescs's residence, Lescs assisted with unlocking the three

outside locks on the front door.  (*Id.*)  Officers had a difficult time gaining entry through the front

door because of the amount of trash in the house.  (Trillio Aff. ¶ 16.)  When Lescs bent over to

unlock the door, there was an overwhelming smell of feces emanating from Lescs's lower body.

Hyde struggled not to get sick from the smell.  The smell from the house was much worse.  Hyde

had to walk away from the home and Lescs several times to catch her breath due to the incredible

smell.  (Hyde Aff. ¶ 25; Niang Aff. ¶¶ 21–30.)  Trillio could smell the house from the sidewalk.

(Trillio Aff. ¶ 17.)  She described it as a "very troubling scene.  Ms. Lescs was seemingly unaware

of the condition of the house, property, and cars.  She appeared oblivious to the true condition of her

surroundings.  Overall, there appeared to be a disconnect between the statements made by Ms.

Lescs and the circumstances she was living in." (*Id.* ¶¶ 18–20.)  Officer Niang advised Hyde of

fecal stained clothing in Lescs's car, maggots in the food bowls for the cats, feces and urine

throughout the home, and the general squalid condition of the home.  Hyde observed bugs jumping

from Officers Niang and Slonaker when they would leave the house to catch their breath.  (Hyde

Aff. ¶ 28; Niang Aff. ¶ 45.)

Given the condition of Lescs's home and property and Hyde's perception of delusional,

paranoid, and rambling statements made by Lescs, Hyde was concerned for Lescs's safety and her

ability to care for herself.  (Hyde Aff. ¶ 30.)  Based on the totality of Hyde's observations and

perceptions of the objective facts on August 24, 2017, gathered from discussions with Lescs, her

sister, and the other officers on the scene who entered the home, Hyde believed there was probable

cause that Lescs had a mental illness and there existed a substantial likelihood that Lescs would not

be able to provide for her basic human needs.  Hyde felt that harm may come to Lescs as a result of

her mental illness and her lack of capacity to protect herself from harm, as she was an elderly lady

living in her car in a Walmart parking lot.  (*Id.* ¶ 31.)  Trillio was also concerned that Lescs was

unable to care for herself.  (Trillio Aff. ¶ 24.)

During the time Hyde was with Lescs at the hospital, Lescs appeared tired and hungry.  She

ate two box lunches.  (Hyde Aff. ¶ 32.)  Lescs stated that there were two more animals at her

residence, and she gave Officer Niang permission to retrieve them from the room behind the

stairwell.  (*Id.* ¶ 33.)  Hyde left the hospital temporarily for another assignment.  Before leaving,

Hyde discussed working with Lescs on a plan of care, returning to work with her, and escorting her

home if she was released.  NWCSB staff released Lescs on a safety plan.  Lescs took a taxi home,

stating that she "had had enough of the officers on this date." (*Id.* ¶¶ 34–35.)

## II.  ANALYSIS

### A.  Motion to Dismiss Standards

Under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The court "must accept as true all of the factual allegations in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and all reasonable inferences must be drawn in the plaintiff's favor.  *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).  Lescs's pro se complaint is entitled to a liberal construction. *Erickson*, 551 U.S. at 94.  Even so, the court is not obliged to become an advocate for the unrepresented party, *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 391 (4th Cir. 1990), or "to construct full blown claims from sentence fragments," *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).  Moreover, allegations consisting of "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" are not sufficient.  *Twombly*, 550 U.S. at 555.  And "legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments" need not be accepted as true.  *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012).  The rule, however, does not countenance dismissals based on a judge's disbelief of a complaint's factual allegations.  *Scheuer v. Rhodes*, 416 US 232, 236 (1974).

### B.  Summary Judgment Standards

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A material fact is one that "might affect the outcome of the suit under the governing law."  *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986)).  A dispute of material fact is "genuine" if sufficient evidence favoring the non-moving

party exists for the trier of fact to return a verdict for that party.  *Anderson*, 477 U.S. at 248–49.

The moving party bears the initial burden of showing the absence of a genuine dispute of

material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party makes this showing, however, the

opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other

means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial.

*See* Fed. R. Civ. P. 56(c), 56(e).  All inferences must be viewed in a light most favorable to the non-

moving party, but the nonmovant "cannot create a genuine issue of material fact through mere

speculation or the building of one inference upon another."  *Beale v. Hardy*, 769 F.2d 213, 214 (4th

Cir. 1985).

## C.  Individual Defendants' Motion To Dismiss[8]

The individual defendants who filed the motion are Sanzenbacher, Bauserman, Niang,

Slonaker, Hess, former Fire Chief Doe, Hyde, Grisdale, Willingham, Freeman, Mowrey, and John

Doe Police Officers.  Of these defendants, the only ones alleged to be directly involved in the

August 24, 2017 incident are Mowrey (who paid the women who "most likely" reported plaintiff),

Niang, Slonaker, and Hyde (who were present during the incident), and Hess (who said he will take

photographs of the interior of the home from the door),[9]  Regarding the FOIA / spoliation

conspiracy allegations, plaintiff notes only that the WPD, the Social Services Department, and the

Health Department did not respond to her claims.  Regarding her miscellaneous claims, plaintiff

---

[8] Lescs sues the individual defendants in their individual and official capacities, but the official capacity claims are redundant to Lescs's claims against the City of Winchester.  Therefore, Lescs's official capacity claims against the individual defendants will be dismissed.  *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 307 n.13 (4th Cir. 2006) ("The § 1983 claims against the Administrators in their official capacities are essentially duplicative of the § 1983 claims against the Board.").

[9] Fire Marshal Luttrell is also mentioned as a person who was going to enter and take photographs.  He is not, however, a defendant, and it is unclear if he was even present.

only mentions defendant Hess and the Zoning Department, who have cited her house, and that the WPD has not been responsive to her reports over the years.

1. **Failure to sufficiently allege personal involvement or supervisory liability regarding Sanzenbacher, Lt. Bauserman, Former Winchester Fire Chief John Doe, Mr. Grisdale, John Willingham, Eden Freeman, Mowrey, Hess, and John Doe Police Officers**

The individual defendants move to dismiss on the grounds that Lescs did not plead facts to show how each defendant violated her constitutional rights. *Williamson v. Stirling*, 912 F.3d 154, 171 (4th Cir. 2018) ("To establish personal liability under § 1983, the plaintiff must affirmatively show that the official charged acted personally in the deprivation of the plaintiff's rights."); *Averette v. Danville City Jail Med. Dep't*, Civil Action No. 7:19-cv-00707, 2020 WL 534054, at *1 (W.D. Va. Feb. 3, 2020) ("[A] § 1983 claim requires factual detail about each defendant's personal involvement."). It appears that many defendants are sued only because of the positions they held or hold or as supervisors of other defendants. Indeed, there are no allegations regarding defendants Sanzenbacher, Lt. Bauserman, the Former Winchester Fire Chief Doe, Mr. Grisdale, John Willingham, Eden Freeman, or John Doe Police Officers.

To the extent these defendants are sued as supervisors, Lescs has not alleged facts which would establish supervisory liability under § 1983. Sufficient allegations of supervisory liability require, among other things, factual allegations that would establish that the supervisors had "actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). For these reasons, the court will grant the motion to dismiss of these defendants and dismiss them without prejudice.

In a conclusory allegation, defendant Mowrey is alleged to have paid the two women who Lescs believes "most likely" reported her for being mentally ill and having dead cats. This

allegation is mere speculation and unsupported by any facts.  Regarding defendant Hess, he is only alleged to say that he would take photographs of the home from the door.  This threadbare allegation is insufficient to state a violation of a constitutional right.  Moreover, Lescs admits that the home was in disarray, but she blames it on vandals.  For these reasons, the court will grant the motion to dismiss of Mowrey and Hess and dismiss them without prejudice.

### 2.  Sufficient allegations for a Fourth Amendment claim regarding Niang, Slonaker, and Hyde

A review of Lescs's complaint, along with the affidavit filed with it, reveals allegations of the personal involvement of Niang, Slonaker, and Hyde.

Lescs alleges that Niang, Slonaker, and Hyde violated her rights under the Fourth Amendment.  The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  Section 1983 provides a damages remedy for violations of the Fourth Amendment.  *See Wilson v. Layne*, 526 U.S. 603, 609 (1999).  The Fourth Amendment "prohibits law enforcement officers from making unreasonable seizures, and seizure of an individual effected without probable cause is unreasonable."  *Brooks v. City of Winston-Salem, N.C.*, 85 F.3d 178, 183 (4th Cir. 1996); *see also Bailey v. United States*, 568 U.S. 186, 192 (2013) ("The general rule is that Fourth Amendment seizures are reasonable only if based on probable cause to believe that the individual has committed a crime.").

With respect to Niang and Slonaker, the court finds that Lescs has stated a Fourth Amendment claim for allegedly detaining and handcuffing Lescs without cause.  With respect to Hyde and the motion to dismiss, the court finds that Lescs has stated a Fourth Amendment claim for excessive use of force by continuing to leave Lescs handcuffed in her front yard and for seizing Lescs and transporting her to the hospital for a mental health evaluation without cause.  *See Dobbs*

16

*v. Townsend*, 416 F. Supp. 3d 441, 448 (D. Md. 2019) ("Claims for the use of excessive force in effectuating an arrest or other seizure are governed by the Fourth Amendment's prohibition against unreasonable seizures.") (citing *Graham v. Connor*, 490 U.S. 386, 394–95 (1989)); *Archie v. City of Chi.*, Case No. 19 CV 4838, 2020 WL 5751185, at *4–6 (N.D. Ill. Sept. 25, 2020) (finding that plaintiff stated a Fourth Amendment claim for unreasonable seizure based on allegation that she was handcuffed "without need and for an unreasonably long time" because "whatever governmental interest there was in keeping Archie in handcuffs evaporated within minutes").[10]  For these reasons, the court will deny the motion to dismiss as to defendants Niang, Slonaker, and Hyde for alleged Fourth Amendment violations.

### 3.  Equal protection claim will be dismissed

Lescs also alleges that her arrest violated her rights under the Equal Protection Clause.  To state an equal protection claim, Lescs must allege that she was treated differently from others who are similarly situated and the unequal treatment was the result of intentional or purposeful discrimination.  *White v. City of Annapolis*, Civil Action No. CCB-19-1442, 2020 WL 534547, at *7 (D. Md. Feb. 3, 2020) (citing *Martin v. Duffy*, 858 F.3d 239, 252 (4th Cir. 2017)).  In addition to the failure to allege personal involvement of many of the named defendants, this claim must be dismissed without prejudice because Lescs's generic allegations do not state an equal protection claim.

---

[10]  Defendants' motion to dismiss raises qualified immunity as a defense without much analysis, but only with respect to the Fourth Amendment's community caretaker exception, which applies when a person is seized for a mental health evaluation.  *Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 334 (4th Cir. 2009).  Because of the court's ruling on the summary judgment motion, the court need not address qualified immunity on this issue regarding Hyde.  Defendants Niang and Slonaker may brief this issue in the future if they submit a summary judgment motion.  The other actionable Fourth Amendment claim in Lescs's complaint does not implicate this exception because defendants do not contend that the community caretaker exception justified leaving Lescs handcuffed in her front yard before taking her to the hospital.

### 4.  Conspiracy allegations are insufficient to state a claim

Lescs further asserts federal conspiracy claims under §§ 1983 and 1985, alleging that the WPD, the Social Services Department, and the Health Department conspired to commit spoliation and conceal evidence during the state FOIA proceeding initiated by plaintiff.  (Compl. ¶¶ 23, 57, Section H.)  If broadly and very liberally construed, and despite the more specific language included in the conspiracy section of the complaint (Dkt. No. 2 at 29–33), she asserts that all the defendants conspired to have her involuntarily committed and take her home from her.  Lescs's complaint, however, includes only a "bare assertion of conspiracy" and does not plausibly allege a meeting of the minds of defendants to deprive plaintiff of any constitutional rights.  *See Nutter v. Mellinger*, Civil Action No. 2:19-cv-00787, 2020 WL 401790, at *5 (S.D.W. Va. Jan. 23, 2020) (citing *Wiggins v. 11 Kew Garden Court*, 497 F. App'x 262, 264 (4th Cir. 2012), and *Simmons v. Poe*, 47 F.3d 1370, 1377 (4th Cir. 1995)).

As to her specific conspiracy claims, they are brought against the WPD, the Social Services Department, and the Health Department pursuant to 42 U.S.C. §§ 1983 and 1985.  First, none of these entities are defendants.  Second, and assuming these entities are all defendant City of Winchester departments, which the court doubts, the City cannot conspire with itself.  *See Zombro v. Baltimore City Police Dep't*, 868 F.2d 1364, 1371 (4th Cir. 1989) (observing that a city police department, even if it were a person, "may not conspire with itself"); *Karagiannopoulos v. City of Lowell*, No. 3:05-cv-00401-FDW, 2008 WL 2447362, at *6 (W.D.N.C. June 13, 2008) ("Just as a corporation cannot conspire with itself, the City, a single 'person' under § 1985, is similarly incapable of conspiring with itself.").  Finally, Lescs's complaint does not properly allege a conspiracy under either statute.  The alleged conspiracy is one to commit spoliation as evidenced by responses to a state Freedom of Information Act (FOIA) request to facilitate the cover-up the facts

18

of the August 24, 2017 incident.  Lescs is required to state facts sufficient to allege plausibly that defendants "acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the] deprivation of a constitutional right" to plead civil conspiracy under § 1983.  *Hinkle v. City of Clarksburg. W. Va.*, 81 F.3d 416, 421 (4th Cir. 1996).  In other words, a conclusory allegation of conspiracy is insufficient and an allegation regarding the deprivation of a constitutional right is required.  Plaintiff's complaint contains only conclusory statements, and the court is not aware of any case establishing a constitutional right to have documents retained for purposes of a state FOIA request or a federal cause of action for spoliation.

### 5.  State law claims

Regarding Lescs's state law claims,[11] the individual defendants ask the court to decline to exercise supplemental jurisdiction over these claims.  The court will do so with regard to those individual defendants that are being dismissed without prejudice because Lescs does not allege their personal involvement to state a claim sufficiently.  Thus, the court will not exercise any supplemental jurisdiction over state claims against those defendants.  The court will, however, retain jurisdiction over the state law claims against Niang, Slonaker, and Hyde because Lescs has

---

[11] As noted above, Lescs also requests declarations that HIPAA and the Virginia "Judicial Authorization of Treatment" statute are unconstitutional.  To the extent that these requests can be construed as federal claims raising federal issues, plaintiff's complaints about these statutes do not present live controversies.  *See Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941) ("[T]he question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."); *Sansotta v. Town of Nags Head*, 97 F. Supp. 3d 713, 726 (E.D.N.C. 2014) ("The court may issue a declaratory judgment only '[i]n a case of actual controversy.'") (quoting 28 U.S.C. § 2201).  Additionally, Lescs does not allege any HIPAA violation.  Furthermore, she has not given notice to the United States Attorney General or the Virginia Attorney General to challenge the constitutionality of a federal or state statute.  *See* Fed. R. Civ. P. 5.1(a)(2).

Also as noted, Lescs alleges claims for violation of the Geneva Convention and the War Crimes Act of 1996.  These enactments do not provide for a private cause of action.  *See Nall v. Sussex Corr. Inst.*, Civil Action No. 19-2187-RGA, 2020 WL 1975155, at *4 (D. Del. Apr. 24, 2020) ([T]he Geneva Convention, which codifies the law of war, does not confer standing to bring a private civil suit.") (citing *Nattah v. Bush*, 770 F. Supp. 2d 193, 204 n.5 (D.D.C. 2011)); *Sai v. Trump*, 325 F. Supp. 3d 68, 71–72 (D.D.C. 2018) (dismissing claim brought for violations of 18 U.S.C. § 2441, the War Crimes Act of 1996, because it "does not create a private cause of action").

federal claims against those defendants that survive the motion to dismiss.  While these defendants argue that Lescs failed to state any plausible state law claims against them, their brief contains no analysis of the state claims.  Therefore, the individual defendants' motion will be denied to the extent that Lescs may have stated an actionable state law claim against Niang, Slonaker, and Hyde.

In sum, the individual defendants' motion will be denied with respect to the Fourth Amendment claims described herein against Niang, Slonaker, and Hyde.  It will also be denied with respect to the state law claims against Niang, Slonaker, and Hyde.  The motion will be granted in all other respects.

**D.  City Of Winchester's Motion To Dismiss**

The City of Winchester argues that Lescs's federal claims against it should be dismissed because she does not plausibly allege municipal liability under § 1983.  The court agrees that Lescs does not plausibly allege that a policy or custom contributed to her injuries.  *See Brown v. Wexford Health Sources, Inc.*, Civil No. JKB-17-1212, 2020 WL 1984905, at *4 (D. Md. Apr. 27, 2020) ("Under *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978), to prove a 42 U.S.C. § 1983 claim against an entity acting under color of state law, a plaintiff must show not only that an agent of the entity violated his rights, but also that the entity's policies or customs caused the violations.").

Regarding the state law claims, the City perfunctorily argues that Lescs did not allege any facts sufficient to state a plausible claim against the City, and also that it is entitled to sovereign immunity as to any claim based on the alleged negligence of its employees.  Because the complaint states a § 1983 claim against three of the City's employees, the court declines to dismiss any state law claims against the City in the absence of more thorough briefing.

**E.  John Doe Neighbors, Including John Hamilton**

Lescs alleges that Hamilton (presumably one of the John Doe Neighbors) is "responsible for

breaking and entering into plaintiff's home and ransacking, pillaging and stealing from the contents

therein."  (Compl. ¶ 18.)  This occurred for "many years, even though the plaintiff made many

complaints to the WPD, to no avail.  Also, some neighbors supposedly acted as agents of, and were

paid by, the City to report on Lescs.  None of these allegations relate to the August 4, 2017 incident.

Lescs returned a summons and USM-285 form identifying "John Hamilton" as a John Doe

Neighbor.  A summons was issued on September 11, 2019.  (Dkt. No. 5.)  According to the return,

the United States Marshal attempted service on October 9, 2019.  There was no answer at the door,

but the neighbor outside indicated that Hamilton lives at the residence.  The Marshal attempted

service again on November 6, 2019.  On that date, the Marshal served Hamilton's wife, who

indicated she would be sure Hamilton got the summons.  (Dkt. No. 22.)  This qualifies as effective

service upon Hamilton.  *See* Fed. R. Civ. P. 4(e)(2)(B) (providing that a person may be served in a

judicial district in the United States by "leaving a copy of [the summon and complaint] at the

individual's dwelling or usual place of abode with someone of suitable age and discretion who

resides there"); *Marshall v. Deutsche Bank Nat'l Trust Co.*, Civil Action No. SA-13-CV-937-OLG,

2014 WL 12489736, at *7 (W.D. Tex. July 21, 2014) ("Federal Rule of Civil Procedure 4(e)(2)(B)

allows service of process by leaving a copy of the summons and complaint with a defendant's

spouse at the defendant's dwelling.").  To date, Hamilton has not appeared or filed an answer in this

action.  Thus, it appears that Hamilton is in default, and the entry of default against him could be

entered.  *See* Fed. R. Civ. P. 55(a).

The court will not direct the entry of default, however, because Lescs's complaint attempts

to join unrelated events and defendants (the John Doe Neighbors, including Hamilton) and would

result in the misjoinder of claims or defendants.  The claims against the neighbors are unrelated to

the incident of August 4, 2017, or to any alleged cover up under FOIA.  Lescs is simply not

permitted to bring all these claims in a single lawsuit.  Federal Rule of Civil Procedure 18(a) only

allows a plaintiff to join "as many claims as it has against an opposing party."  Fed. R. Civ. P. 18(a)

(emphasis added).  Rule 20 allows the joinder of several defendants only if the claims arose out of

the same transaction or occurrence, or series thereof, and contain a question of fact or law common

to all the defendants.  Fed. R. Civ. P. 20(a)(2).  Thus, if the claims arise out of different transactions

and do not involve all defendants, joinder of the claims against various defendants in one lawsuit

should not be allowed.  *Riddick v. Dep't of Corr.*, No. 7:17CV00268, 2017 WL 6599007, at *1

(W.D. Va. Dec. 26, 2017) ("[A] plaintiff may name more than one defendant in a multiple claim

lawsuit only if the claims against all defendants arose out of the same incident or incidents and

involve a common factual or legal question.")  Therefore, the court will dismiss, without prejudice,

Lescs's claims against the John Doe Neighbors, including Hamilton.

## F.  Hyde's Motion For Summary Judgment Regarding The Mental Health Evaluation Claim Will Be Granted

Hyde moves for summary judgment on Lescs's Fourth Amendment claim as it pertains to

Lescs being taken into custody for a psychological evaluation.  She does not move for summary

judgment as to the lengthy handcuffing alleged by Lescs.  Under Virginia law, a "law enforcement

officer who, based upon his observation or the reliable reports of others, has probable cause to

believe that a person meets the criteria for emergency custody . . . may take that person into custody

and transport that person to an appropriate location to assess the need for hospitalization or

treatment without prior authorization."  Va. Code § 37.2-808(G).  Emergency custody is proper

when there is probable cause to believe that any person (i) has a mental illness and that there exists

a substantial likelihood that, as a result of mental illness, the person will, in the near future, (a)

cause serious physical harm to himself or others, or (b) suffer serious harm due to his lack of

capacity to protect himself from harm or to provide for his basic human needs, (ii) is in need of

hospitalization or treatment, and (iii) is unwilling to volunteer or incapable of volunteering for hospitalization or treatment.  Va. Code § 37.2-808(A).

In the criminal arrest context, probable cause exists where "the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the defendant had committed or was committing an offense."  *Beck v. Ohio*, 379 U.S. 89, 91 (1964).  Lescs was not arrested for committing a crime; instead, she was seized for purposes of a psychological or mental health evaluation.  To justify such a seizure, the "facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information [must have been] sufficient to warrant a prudent man," *id.*, to "believe that the person poses a danger to himself or others," *Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 334 (4th Cir. 2009).

A review of Lescs's complaint, her affidavit, and the uncontradicted facts set forth in Hyde's affidavit demonstrate that Hyde, a crisis intervention team trained officer, carefully considered all of the information that she had from personal contact with Lescs and from others who observed Lescs, took extra steps to gain information from a mental health provider and from Lescs's sister, attempted to persuade Lescs to voluntary submit to a mental health evaluation, and had reasonably trustworthy information sufficient to warrant a reasonable officer to believe that Lescs posed a danger to herself.  Pursuant to Virginia Code § 37.2-808 and as a matter of law, emergency custody of Lescs was proper because there was probable cause to believe that Lescs would suffer serious harm due to her lack of capacity to protect herself from harm or to provide for her basic human needs, was in need of hospitalization or treatment, and was unwilling to volunteer or incapable of volunteering for hospitalization or treatment.

Hyde had been called to the home before regarding neighbors' concerns about Lescs's mental health.  When present on August 24, 2017, she observed trash and filthy conditions in the vehicles and home and hoarding tendencies.  She heard contradictions in Lescs's description about the health of her pets, and seemingly delusional statements about attempts on Lescs's life through automobile accidents (possibly related to Dow Chemical and Lescs's lawsuit against it), payments to informants by a law enforcement officer and the death of five of those informants, and an event at Walmart where law enforcement attempted to take Lescs in to custody by using a helicopter.  Hyde consulted with Trillio, a mental health worker who works for NWCSB as a CIT Coordinator, who, by Lescs's own admission said, "I think there is something there."  There being no genuine issue of material fact, the court will grant Hyde's motion for summary judgment and dismiss, with prejudice, the Fourth Amendment claim regarding Lescs's detention and transportation for a psychological evaluation by defendant Hyde.[12]

### III.  CONCLUSION

For the above reasons, the individual defendants' motion to dismiss will be granted in part and denied in part, the City of Winchester's motion to dismiss will be granted in part and denied in part, Imans (to the extent he is even a defendant) will be dismissed without prejudice, John Doe Vagrants will be dismissed without prejudice, John Doe Neighbors (including Hamilton) will be dismissed without prejudice, and Hyde's motion for summary judgment will be granted.

The claims that remain in this case are as follows:

1.      Lescs's Fourth Amendment claims against defendants Niang and Slonaker for allegedly detaining and handcuffing plaintiff without cause;

---

[12] Given this ruling, there is no need for the court to address the qualified immunity argument.

2.      Lescs's Fourth Amendment claim against defendant Hyde for alleged excessive use of force by continuing to leave plaintiff handcuffed in her front yard; and

3.      Lescs's state law claims against Niang, Slonaker, Hyde, and the City.

The court will enter an appropriate order.

Entered: November 30, 2020.

*/s/ Elizabeth K. Dillon*

Elizabeth K. Dillon
United States District Judge